Debbie Leonard (#8260)
Leonard Law, PC
955 South Virginia Street, Suite 220
Reno, Nevada 89502
(775) 964-4656
debbie@leonardlawpc.com

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BAKER RANCHES, INC., a Nevada corporation, DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE, as Co-Trustees of the DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE FAMILY LIVING TRUST, dated January 31, 2007; ZANE JORDAN; and JUDEE SCHALEY, <br><br> Plaintiffs, <br><br> v. <br><br> DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior, the UNITED STATES DEPARTMENT OF THE INTERIOR, SHAWN BENGE, in his official capacity as Acting Director of the National Park Service, the NATIONAL PARK SERVICE, and JAMES WOOLSEY, in his official capacity as Superintendent of the Great Basin National Park, <br><br> Defendants. | 3:21-CV-00150-LRH-WGC <br><br><br> **MOTION TO REMAND** |

Plaintiffs BAKER RANCHES, INC. ("Baker Ranches"), DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE, as Co-Trustees of the DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE FAMILY LIVING TRUST, dated January 31, 2007; ZANE JORDAN; and JUDEE SCHALEY (collectively, "Plaintiffs"), by and through their undersigned attorney, Debbie Leonard of Leonard Law, PC, move the Court to remand this case to the state court.

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

This motion is based on the points and authorities that follow, the exhibits and declarations provided in the supporting appendix, and such other matters as the Court may wish to consider.

**POINTS AND AUTHORITIES**

**I.     Introduction**

The complaint in this case asserts just one claim that asks the Nevada state court to enforce its own water rights decree. Under the doctrine of prior exclusive jurisdiction, the state decree court is vested with the exclusive authority to administer and enforce the decree that it entered. Ninth Circuit authority that is directly on point makes clear that the Court lacks subject matter jurisdiction over this case and remand is required.

Defendants' reference to 28 U.S.C. §1442 as their basis for removal does not alter that conclusion. Section 1442 does not establish federal jurisdiction; it simply allows the United States to remove a case if an independent source of federal jurisdiction exists. None does here.

Simply because the Defendants may wish to raise a sovereign immunity defense does not authorize removal. Jurisdiction must be determined from the complaint, not from defenses. In any event, this case falls squarely within the purview of the McCarran Amendment's waiver of sovereign immunity. Should the Defendants wish, upon remand, to claim immunity in the state court, their argument will inevitably fail.

In that Defendants have no reasonable basis for removal, remand is required and an award of fees and costs to Plaintiffs is warranted.

**II.    Factual and Procedural Background**

**A.   The Baker-Lehman Decree Issued by The State Court**

Plaintiffs own, hold, maintain, and are the lawful successors in interest to water rights that were adjudicated and decreed pursuant to the Findings of Fact, Conclusions of Law and Decree entered on October 16, 1934, as corrected nunc pro tunc on February 23, 1950, in Case No. 2874, *In the Matter of the Determination of the Relative Rights in and to the Waters of Baker and Lehman Creeks and Tributaries in the County of White Pine, State of Nevada* ("the Decree") to irrigate farming and grazing lands in White Pine County, Nevada, as follows:

Leonard Law, PC
955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

a.   Plaintiff Baker Ranches, Inc.'s share of Proof of Appropriation No. 01066 is appurtenant to 1,751.87 acres and has a priority date between 1872 to 1904.

b.   Plaintiff David John Eldridge and Ruth Eldridge Family Living Trust's share of Proof of Appropriation No. 01066 is appurtenant to 8.8 acres and has a priority date of 1872.

c.   Plaintiffs Zane Jordan's and Judee Schaley's share of Proof of Appropriation No. 01066 is appurtenant to 7.13 acres and has a priority date of 1876.

Ex. 1, Declaration of Craig Baker ("Baker Decl.") ¶¶5-7 (0002-0003)[1]; Ex. 2, Baker-Lehman Decree (0014-0054); Ex. 39, Declaration of Judee Schaley ("Schaley Decl.") ¶3 (0211); Ex. 40, Declaration of Ruth Eldridge ("Eldridge Decl.") ¶4 (0213).

Defendant National Park Service ("NPS") claims to be the successor-in-interest to two water rights adjudicated under the Decree: Proofs of Appropriation Nos. 01065 and a portion of No. 01066. Ex. 43 (0223). Proof of Appropriation No. 01065 is for irrigation of 7.5 acres and has a priority date of 1890. Ex. 2 (0014-0054). The claimant in the decree is Clarence ("CT") Rhodes, who managed the Lehman Caves National Monument on behalf of the United States at the time the Proof was filed. Ex. 2 at p.7 (0020); Ex. 41 (0215-0216); Ex. 42 (0221). Defendant United States Department of the Interior filed an application to change the point of diversion, place of use and manner of use of Proof 01065 for domestic, recreation and fire protection purposes for use at the Lehman Caves Visitor Center, which was approved by the Nevada State Engineer on April 7, 1964. Ex. 3, Permit 20794 (0056-0057). The records of the Nevada Division of Water Resources under 01065 contain a filing by the United States Department of the Interior that claimed the use under that proof existed "since prior to the adjudication." Ex. 43, Change Appl. for V01065 at 2 (0224).

> The United States claims the right to the full appropriation by virtue or a deed from the Commissioners of White Pine County to the United States or America, Department of Agriculture, dated September 18, 1934, and recorded in Book 118, pages 221-222 of the records or the county Recorder, which conveyed … "the

[1] The appendix of exhibits page numbers follow each exhibit reference pursuant to LR IA 10-3(c).

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

waters or Cave Spring, evidenced by proof of appropriation No. 01065 on file in the office of the State Engineer, State of Nevada."

Ex. 43, p. 3 (0225). NPS's share of Proof of Appropriation No. 01066 is for irrigation of 25 acres just north of the town of Baker and has a priority date of 1904. Ex. 2 at p.19 (0031).

The Decree provides, inter alia, the following:

That the Judgment and Decree to be hereinafter entered should provide that each and every water user of the Baker and Lehman Creeks stream system and its tributaries, and each of agents, attorneys, servants, employees, and their respective successors in interest, and each and every person acting in aid or assistance of said parties, or either or any of them, be perpetually enjoined and restrained as follows, to-wit:

(a) From at any time diverting or using or preventing or obstructing the flow, in whole or in part, in or along its natural channel, of any of the water or said stream system, except to the extent and in the amount and in the manner and at the time or times fixed by this Decree and allocated, allowed, prescribed, and determined to such parties respectively, and as may be allowed in the permits which have been or may hereafter be granted by the State Engineer of the state of Nevada.

(b) From diverting from the natural channel and from using any of the said water for irrigation or any other purpose in excess of the amount specifically allotted to or for said party herein and fixed by this Decree, or in excess of the specified allotment under such permit or permits so heretofore granted or which may hereafter he granted by said State Engineer.

(c) From diverting from the natural channel and from using any of the said waters in any other manner or for any other purpose or purposes or upon any other land or lands or in any other amount than as provided and prescribed by the terms or this Decree or by any such permit so granted by said State Engineer.

(d) From diverting from the natural channel and from using any of the said water at any other time or times than as specified and provided by the terms of this Decree or by any such permit so granted by the said State Engineer.

(e) From in any manner meddling with, opening, closing, changing, injuring, or interfering with any headgates, weirs, water-boxes, flumes, or measuring devices, or either or any of them, placed, installed, established, or approved by said State Engineer or by his authority or direction, unless such act be done with the permission or authority of the water commissioner or commissioners on said stream system during the period of his regulation or control of said water, or, if not done during such period of his control, then by virtue or the allowances, authority, terms, and provisions of this Decree or by a permit so granted by said State Engineer.

Ex. 2 at pp. 26-27 (0038-0039). The Decree arose from the Nevada State Engineer's Final Order of Determination of the relative rights to Baker and Lehman Creeks following an

Leonard Law, PC
955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

adjudication conducted pursuant to Nevada law. Ex. 2 at pp. 4-6 (0017-0019); Act of Mar. 22, 1913, ch. 140, 1913 Nev. Stat. 192 (codified as amended at Nev. Rev. Stat. ch. 533).

**B.  Plaintiffs' Rights Are Senior to Any Rights Asserted by NPS**

What is now the Great Basin National Park ("the Park") was previously managed by the United States Forest Service as part of the Nevada National Forest, which was withdrawn from the public domain and created on February 10, 1909. *See* History of the Toiyabe National Forest:          A          Compilation,          available          at https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev3_042121.pdf   at   p.128.   The Nevada National Forest was later incorporated into the Humboldt National Forest in 1957. *Id.*

The Park was created on October 27, 1986 by Public Law 99-565 ("the GBNP Enabling Act"), which indicated that withdrawal of lands for the Park was "subject to valid existing rights." https://www.congress.gov/99/statute/STATUTE-100/STATUTE-100-Pg3181.pdf; 16 U.S.C. §410mm-1(d). The GBNP Enabling Act makes clear that creation of the Park "shall [not] be construed to establish a new express or implied reservation to the United States of any water or water-related right with respect to" the lands withdrawn for the Park, and "[n]o provision of this Act shall be construed as authorizing the appropriation of water, except in accordance with the substantive and procedural law of the State of Nevada." 16 U.S.C. §410mm-1(h).

Baker and Lehman Creeks originate in and flow through the Park. Ex. 4, Demonstrative Maps (0059-0064); Ex. 1, Baker Decl. ¶8 (0003). The point at which the Plaintiffs divert water from Baker and Lehman Creeks is downstream of the Park boundary and outside the Park. Ex. 1, Baker Decl. ¶8 (0003). The places of use of the Plaintiffs' water rights are in White Pine County, Nevada, outside the Park boundary. *Id.* The availability of water flows to satisfy Plaintiffs' decreed water rights depends on the unobstructed, undiverted and unconsumed flow of water in Baker Creek and Lehman Creek through the Park. *Id.*

///

///

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

**C. Plaintiffs and Their Predecessors Engaged in Activities to Ensure the Free Flow of Their Senior Priority Water To Their Points of Diversion and to Capture Water That Would Otherwise be Lost into Caves and Sinks**

**1. Actions to Control Flows and Prevent Water Losses**

The historical record and first-hand accounts indicate that Plaintiffs' predecessors took actions starting more than 100 years ago to control the flows of Baker Creek and to salvage Baker Creek water to prevent it from being lost into sinks, cracks and caves along the channel. Ex. 1, Baker Decl. ¶¶9-10, 12, 14-16, 49-52 (0003-0005, 0010-0011). Two particular features into which water can be lost are known as Ice Cave and Sink, which is in the Baker Creek Narrows. *Id.* at ¶11 (0004); Exs. 29-30, 37, Photos of Sink (0154-0157, 0203-0206). Because high flows cause rocks and debris to move within the channel, after the spring run-off, Plaintiffs and their predecessors regularly entered into the Baker Creek channel, using machinery and by hand, to clear channel obstructions, move rocks and debris and block the openings of the caves, cracks and sinks located in the Baker Creek Narrows to prevent the loss of their decreed water rights. Ex. 1, Baker Decl. ¶¶9-15, 17, 28 (0003-0005, 0007).

Daisy Gonder, a previous owner of a portion of V01066, testified under oath regarding the historical annual practice of the Baker Creek water users to divert water away from the caves to maximize flows and push high water during the spring run-off towards the caves to prevent downstream flooding.[2] Ex. 5, Excerpts of Daisy Gonder Depo. Trans. (0066-0074). Ms. Gonder testified:

> I personally know that my husband and I and Fred Baker and then Dean Baker went up there numerous times of the year to control that water in Baker Creek.

\*      \*      \*

> I went up with my husband. He was approached by Mr. Fred Baker to come and help divert the water, the high water that was coming down, and literally what you do is have your boots on and you get in the creek and you move a few rocks to turn it into a hole so it lessens the amount of water coming down the hill…. ***When the water -- when the high water went down, that's when they went up and turned the water back into the creek***.

---

[2] This latter practice is no longer necessary because Plaintiffs now have heavy machinery that was not available in the past to spread water during high flows and prevent flooding of their ranches. Ex. 1, Baker Decl. ¶15 (0004-0005).

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

6

Ex. 5, Daisy Gonder Depo. Trans. at 14:2-20:10 (emphasis added) (0067-0076). The first time Ms. Gonder participated in this practice was 1966, twenty years before the Park was created. *Id.* at 14:13-15 (0067). She moved the Baker Creek water every year, even after the Park was established, and no one ever prevented her from doing that work. *Id.* at 18:7-19:25 (0071-0072).

Craig Baker has gone to numerous locations along Baker Creek to move rocks and debris in order to maximize the flows down Baker Creek channel to Baker Ranches' points of diversion, as needed. Ex. 1, Baker Decl. ¶¶13, 28 (0004, 0007). This included moving rocks to block and divert water away from sinks, cracks in the canyon wall, and cave openings that are located along the Baker Creek channel, particularly in Baker Creek Narrows and near Grey Cliffs Campground. *Id* at ¶9 (0003). Fred Baker (grandfather) and Dean Baker (father) did the same thing. *Id.* Craig Baker has his grandfather's journal entries that describe these activities, and his father described them to Craig as well. *Id.* at ¶10 (0004); Ex. 6 (0076-0083). Prior to NPS preventing him from doing so, Craig Baker went up to Baker Creek Narrows nearly every year to ensure that water was not going into the sinks, cracks and caves and to move rocks and obstructions, as needed, to maximize the flow in the channel. Ex. 1, Baker Decl. at ¶17 (0005).

Dean Baker told Craig numerous times that, in the early 1960's, upon permission from the Forest Service, he drove a bulldozer into Baker Creek to clean and straighten the creek channel from Baker Creek Campground through the Narrows. *Id.* at ¶14 (0004). He continued to use heavy equipment from the 1960's through the 1980's to clean and straighten the creek channel or to divert water into or out of the caves. *Id.* The location where this occurred is depicted in Ex. 4(C) (0061).

### 2. Diversion Structures

There are obvious manmade dams and ditches inside the Park that clearly show a long history of efforts prior to the land being withdrawn from the public domain to ensure that the full flow of Baker Creek reaches the points of diversion. Ex. 1, Baker Decl. ¶¶16, 49-51 (0005, 0010-0011). The original 1872 Baker Creek point of diversion established by Baker Ranches'

predecessor was inside what is now the Park boundary just downstream of the Narrows and is depicted in Ex. 4(B) (0060). Ex. 1, Baker Decl. ¶49 (0010); Ex. 7 (0085-0088). This point of diversion is described in documents recorded in the White Pine County Recorder's office in 1887 by George Baker and Willard Burbank. *Id.*

A photo that dates back to the 1920's shows a significant diversion structure in the Narrows adjacent to Sink. Ex. 1, Baker Decl. ¶16 (0005); Ex. 8 (0090-0092). This photo appeared in a pamphlet that was produced by the nearby Meeks Dude Ranch. *Id.* Apparent in the foreground are boards across the creek that are controlling the flow. *Id.* There are still the remnants of fiberboards, plywood and old diversion structures at various locations in Baker Creek narrows. Ex. 1, Baker Decl. ¶16 (0005). In the files of the Division of Water Resources, a report drafted by Assistant Engineer Seymour Case referenced an "old weir up in the canon" of Baker Creek that was observed during a September 10, 1912 field investigation. *Id.* at ¶50 (0010-0011); Ex. 9 (0094-0095).

Moreover, Nevada State Engineer Permit 109 was issued to Baker Ranches' predecessors in 1906 to build dams in the Narrows for the purpose of producing power. Ex. 1, Baker Decl. ¶51 (0011); Ex. 10 (0097-0100). Approximately 200 tons of material was moved for construction of the proposed dam, further demonstrating human structures and activities in the Narrows to make beneficial use of Baker Creek's waters. Ex. 1, Baker Decl. ¶51 (0011); Exs. 10-12 (0096-0104). As is clear from this evidence, some of these practices predated when the lands that are now in the Park were withdrawn from the public domain to create the Nevada National Forest. Exs. 7-12 (0084-0095, 0096-0104). Those that post-dated withdrawal of those lands from the public domain were performed without objection from the Forest Service or the Park Service until 2014. Ex. 1, Baker Decl. ¶¶13-14, 17, 28, 52 (0004-0005, 0007, 0011); Ex. 5, Daisy Gonder Depo. Trans. (0066-0074).

///

///

///

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

8

### D. NPS Has Prevented Plaintiffs From Directing the Flow of Water to Their Points of Diversion And Will Not Take The Steps Necessary To Ensure Creek Flows Reach Plaintiffs' Points Of Diversion

Starting in 2012, Defendants threatened Plaintiffs with law enforcement action should they enter into the Park to remove obstructions to flow and to salvage their decreed water rights from being lost into caves, cracks and sinks. Ex. 1, Baker Decl. ¶21 (0006). Specifically, on or about April 7, 2012, Craig Baker noticed that the flow at the Parshall flume, which is located below the confluence of Baker Creek and Lehman Creek, was uncharacteristically low for that time of year. *Id.* at ¶18 (0005). He discovered that the Baker Creek channel was dry at the Pole Canyon bridge. The locations of the Parshall flume and Pole Canyon bridge are shown on Ex. 4(F) (0064). *Id.* at ¶¶18-19 (0005). Photos taken that day are attached as Ex. 13 (0106-0108). The location of the confluence is shown in Exs. 4(A) and 4(F) (0059, 0064).

With his brother Dave, Craig walked the creek upstream and found that all the water was flowing into Sink. Baker Decl. ¶20 (0005). It appeared as if rocks had been placed in the stream to divert water into Sink. *Id.* Craig estimated that approximately 2-3 cfs, which at the time was the entire flow of Baker Creek, was being lost into Sink. *Id*. The location of Sink is depicted in Ex. 4(A) (0059).

Craig and Dave started to move rocks and other material to direct the water away from Sink and back down the channel. *Id.* at ¶21 (0006). After they had been working for about an hour, a Park Service law enforcement officer appeared and took them to the law enforcement office. *Id.* After being briefly detained, they were driven back to where they had been working. *Id.* Then-Superintendent Andy Ferguson allowed them to finish their work, but thereafter, a new superintendent, Steven Mietz, informed Craig in 2014 that future efforts to maintain the flow in the Baker Creek channel would not be permitted. *Id.* at ¶¶21, 23 (0006).

Flow data from around the 2012 incident, collected by both NPS and Craig Baker, show that there was no flow in Baker Creek below Sink, and the flow above Sink was 2.76 cfs, all of which was lost into Sink. *Id.* at ¶¶24-25 (0006); Exs. 15 and 16 (0111-0114). These data demonstrate that Baker Ranches was without its decreed Baker Creek water when all of the

Leonard Law, PC
955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

water was entering Sink. Ex. 1, Baker Decl. ¶26 (0006-0007). After Craig and Dave Baker's work on April 7, 2012 to redirect the water away from Sink and into the channel, it took 20 days for the water to finally reach Baker. Ex. 1, Baker Decl. ¶22 (0006); Ex. 14 (0110). No subsequent superintendent has authorized Plaintiffs to enter onto Park property to remove obstructions, block the sink and cave openings, and otherwise ensure the flow remains in the channel for delivery to Plaintiffs' points of diversion. Ex. 1, Baker Decl. ¶¶23, 27 (0006-0007).

The problem of water being lost into Sink is particularly acute during dry years. As of July 2020, almost all of Baker Creek's flow again was being lost into Sink, such that Plaintiffs were deprived of their decreed rights. *Id.* at ¶27 (0007). Photos from September 2020 are attached as Ex. 17 (0116-118). *Id.* at ¶27 (0007). They show that Baker Creek was dry at the confluence with Lehman Creek. *Id.* With 2021 proving to be another dry year, Plaintiffs will likely not get their decreed Baker Creek water after the spring run-off. Ex. 1, Baker Decl. ¶61 (0012); Ex. 39, Schaley Decl. ¶6 (0211); Ex. 40, Eldridge Decl. ¶7 (0213).

### E.   NPS Activities That Are Consuming Plaintiffs' Water Rights And Violating The Decree

In addition to preventing Plaintiffs from exercising their water rights, NPS is also diverting and consuming water from Baker and Lehman Creeks without a water right.

#### 1.   Diversion of Water for Campgrounds Without a Water Right

NPS operates campgrounds along Lehman Creek and Baker Creek that have no associated water rights. Ex. 1, Baker Decl. ¶30 (0007); *see* Ex. 2 (0014-0054). Nevertheless, Defendants have diverted tributary water from Baker and Lehman Creeks for use at the campgrounds. Ex. 1, Baker Decl. ¶30 (0007). The approximate locations of these unlawful diversions are depicted in Exs. 4(E) and 4(F) (0063-0064). This water belongs to Plaintiffs, and Defendants' unlawful diversions violate the Decree. *See* Ex. 2 (0014-0054).

#### 2.   Placement of, And Failure to Clear, Debris and Rocks

NPS has engaged in decades of unnatural fire suppression activities, resulting in the proliferation of vegetation and woody debris in Baker and Lehman Creeks and their tributaries

that did not exist at the time Plaintiffs' predecessors established their decreed rights. Ex. 1, Baker Decl. ¶31 (0008). This is confirmed by photographic evidence. Exs. 8, 19-21, 24-25, 31-33, 35 (0090-0092, 0121-0129, 0137-0141, 0158-0175, 0181-0195). The debris dams the natural channel, causing water to be diverted and side channels to develop, which in turn causes evaporation and loss of Plaintiffs' decreed rights and prevents the full amount of Plaintiffs' decreed rights from reaching their points of diversion. Ex. 1, Baker Decl. ¶¶35-37, 39 (0008-0009); Exs. 24-25, 27, 31-33 (0137-0141, 0150, 0158-0175).

NPS has published numerous documents that concede its management activities have dramatically altered the landscape. Ex. 1, Baker Decl. ¶31 (0008); Exs. 21-23 (0126-0136). For example, an historical photo from the early 1920s in the Park's Resource Management Newsletter depicts cliffs at the mouth of the Baker Creek Narrows about 200 yards above Sink. Ex. 1, Baker Decl. ¶32 (0008); Ex. 21 (0127-0129). NPS describes the landscape as "scattered trees on a primarily sagebrush landscape." Ex. 21 (0127-0129). NPS compares that historical photo to one from 2005 in the same location, which NPS acknowledges "shows a large increase of pinyon and juniper trees." *Id.* NPS takes responsibility for this alteration, noting "it is human's suppression of fire that is partially responsible for some of these recent changes. Without fire these communities become choked with vegetation, and soon pinon and juniper trees begin to invade." *Id.* According to NPS, the "ecological implications of this change are profound." *Id.*

The Park's Natural Resource Condition Assessment from 2016 shows that approximately 20 fires have ignited in the Baker Creek basin since 1959 but only one fire had burned since 1980. Ex. 1, Baker Decl. ¶33 (0008); Ex. 22 (0131-0132). No fire has been allowed to burn through the Baker Creek Narrows or up the creek. Ex. 22 (0131-0132. The Great Basin National Park's 2010 Fire Management Plan indicates that: (1) fire was a major ecological factor in the area for the past several hundred years; (2) through tree coring analysis, it has been determined that the mean historical fire interval in the area was 20 years, depending on elevation; and (3) a century of fire suppression has degraded riparian communities by

shifting the landscape away from diverse sage grassland communities to low diversity woody plant communities with heavy fuel loading. Ex. 1, Baker Decl. ¶34 (0008); Ex. 23 (0134-0136).

Because of NPS's unnatural fire suppression, the streams coming out of the Park are jammed with dead trees and woody debris, some of which is diverting water into Sink. Ex. 1, Baker Decl. ¶35 (0008-0009); Exs. 24-25, 31-33, 35 (0137-0141, 0158-0175, 0181-0195). It is difficult to even access the streams through the vegetation, and the unnatural vegetation that NPS has allowed to overtake the landscape is consuming water to which Plaintiffs have priority. Ex. 1, Baker Decl. ¶¶35-36, 39 (0008-0009). This is very different from the historical pictures. Exs. 8, 19, 21 (0090-0092, 0122, 0127-0129). Even when NPS engaged in campground renovation and fuels-reduction projects, it allowed downed woody debris to choke Baker and Lehman Creeks. Ex. 1, Baker Decl. ¶47 (0010). Photos demonstrate that chainsaw-cut tree parts are readily identifiable in the creeks and debris dams. *Id*.; Exs. 24-25, 31-32, 35 (0137-0141, 0158-0170, 0181-0095).

Park visitors routinely build rock dams in Baker and Lehman Creeks, often near the campgrounds. Ex. 1, Baker Decl. ¶46 (0010). These dams impede and spread the creek flow. *Id.* Photos of such rock dams in Baker Creek are attached as Ex. 36 (0197-0201). Photos of rock dams in Lehman Creek adjacent to the campgrounds are attached in Ex. 34 (0177-0179).

The obstructions described in this Motion and the attached exhibits prevent the water from freely flowing down the channel, divert water into Sink, Ice Cave, and other cracks, caves and sinks in the Baker Creek channel, and spread the water and cause it to leave the Baker and Lehman Creek channels and never return. Ex. 1, Baker Decl. ¶48 (0010). Due to the debris that has accumulated, Craig Baker estimates that the Baker Creek stream bed in the area of Sink has risen by three feet in the last few years. *Id.* at ¶38 (0009). When water backs up against debris during high flows, the creeks spread or braid, rather than stay in their channel, causing the loss of Plaintiffs' water rights to evaporation and seepage. *Id.* at ¶39 (0009); Exs. 18, 27, 32-33 (0120, 0150, 0167-0175).

Leonard Law, PC
955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

### 3. Planting of Riparian Vegetation

In locations where the debris has caused Lehman Creek to form side channels, NPS recently planted riparian vegetation. Ex. 1, Baker Decl. ¶¶42, 44 (0009-0010). As Craig Baker recalls, debris dams caused side channels to form from Lehman Creek in 2010. *Id.* at ¶40 (0009). When the Lehman Creek braiding occurred in 2010, Craig Baker restored the water to its original channel. However, the Park Service then put the water into the braided channels again. *Id.*

High flows in 2019, a year that had a 180% snowpack, created rock and debris jams that further split the channels. *Id.* at ¶41 (0009). Photos of these rock and debris jams are in Ex. 32 (0168-0170). Photos of other rock and debris dams in Lehman Creek are in Ex. 31 (0159-0166). The location of the braiding is depicted in Ex. 4(E) (0063).

The Park Service planted vegetation next to one of these braids (labeled the "Second Braid" in Ex. 4(E)) (0063). Ex. 1, Baker Decl. ¶42 (0009). Photos of these plantings are shown in Ex. 26 (0143-0148). Downstream of the debris jams that create this braiding, water no longer flows in the main Lehman Creek channel. Ex. 1, Baker Decl. ¶43 (0009). Photos of the dry historic Lehman Creek channel are shown in Exs. 27 and 33 (0150, 0172-0175). The Park Service also placed vegetation cuttings in the Second Braid. Ex. 1, Baker Decl. ¶44 (0009-0010); Ex. 28 (0152-0153). When water is in the Second Braid, these cuttings slow and spread the water, making it less likely that the water will return to the main Lehman Creek channel. Ex. 1, Baker Decl. ¶44 (0009-0010). The location of the dry Lehman Creek channel, the braids and the Park Service's plantings are shown in Ex. 4(E) (0063). Ex. 1, Baker Decl. ¶45 (0010).

NPS's newly planted riparian vegetation and side channels on Lehman Creek are consuming Plaintiffs' senior decreed rights and preventing Plaintiffs' decreed rights from reaching Plaintiffs' points of diversion. *Id.* at ¶¶44, 48 (0009-0010).

### F. Critical Need For Expedited Relief

The foregoing actions by the Defendants are creating a dire situation for Plaintiffs. The early-season irrigation water from the beginning of the mountain run-off is critical to the

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Baker Ranches' ranch because it is used to water the meadows so they are wet for the spring growth that starts around the beginning of April. Ex. 44, Declaration of Tom Baker ("Tom Baker Decl.") (0237-0238). This watering fills the soil moisture profile, which creates the spring growth of the grasses. *Id.* at ¶4 (0327). These meadows will not be irrigated again until the high runoff water comes out of the mountains in late May early June. *Id.* Because of the decreased flows in Baker and Lehman Creeks, Baker Ranches has missed out, and continues to miss out, on a significant percentage of the early growth of the cool season grasses. *Id.* at ¶5 (0237).

Baker Ranches starts irrigating the field crops on the first of April. *Id.* at ¶6 (0237). The first crop of the year is the most valuable and highest yielding of the season. *Id.* It will account for approximately 60% of the annual crop revenue. *Id.* With forages, Baker Ranches typically gets 3-4 crops per year. *Id.* In addition to the value of the crop, the soil moisture profile of the crop land is important. *Id.* at ¶7 (0237). If Baker Ranches starts June with dry soils, it will be behind on water, which it can cause a reduction in yield for the rest of the season. *Id.*

The annual crops that Baker Ranches grows must be planted and irrigated in April and May. *Id.* at ¶8 (0237). The cool season crops like barley and oats grow better in the spring than in the heat of the summer. *Id.* This also allows the crop to be finished growing by the beginning of July when the high-water flow from the mountain is generally ending. *Id.* Baker Ranches also grows corn to feed its cattle, which must be planted in the beginning of May. *Id.* at ¶9 (0238). Baker Ranches' cropping systems and management of the natural meadows have been adapted to make efficient use of its decreed water and care for the ranch's resources. *Id.* at ¶10 (0238). The drying up of Baker Creek has caused significant problems for Baker Ranches trying to keep the natural resources of the ranch productive and healthy and exacerbates the drought conditions. *Id.* at ¶11 (0238). In addition to the significant economic impacts, the inability to fully wet the meadows and fields in the early season will have possible long-term impacts to their health and productivity. *Id.* at ¶12 (0238).

14

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

### III.   Legal Argument

#### A.  Standard For Remand

Where a plaintiff elects to bring its claims in state court, 28 U.S.C. 1441(a) authorizes the defendant to remove the case to federal court if the federal court has original jurisdiction over the matter. Federal jurisdiction is limited to the power granted by the Constitution and federal statutes. *Gunn v. Minton*, 568 U.S. 251, 256 (2013). Remand should be ordered when the Court lacks subject matter jurisdiction over the removed case. 28 U.S.C. §1447(c).

It is the removing party's burden to demonstrate that federal jurisdiction is appropriate. *Hunter v. United Van Lines*, 746 F.2d 635, 639 (9th Cir. 1984). Because the federal court's jurisdiction is limited, the threshold question is whether the plaintiff's complaint includes a cause of action that would vest jurisdiction in the federal court. *Ansley v. Ameriquest Mortg. Co.*, 340 F.3d 858, 861 (9th Cir. 2003). The Court presumes that a case is not removeable until the defendant demonstrates otherwise. *Hunter v. Philip Morris*, 582 F.3d 1039, 1042 (9th Cir. 2009).

The Court only considers the allegations in the plaintiff's well-pleaded complaint to determine whether a federal claim exists. *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987). The so-called well-pleaded complaint rule excludes from the analysis any federal defenses the defendant may bring and recognizes that the plaintiff is the "master of his or her claim." *Id.*

#### B.  The Court Does Not Have Original Jurisdiction To Enforce The State Decree Because The State Decree Court Has Prior Exclusive Jurisdiction

The Ninth Circuit has addressed nearly identical facts to those presented in this case and concluded that remand was required because "a state court that has adjudicated a water decree retains exclusive jurisdiction over its administration." *State Eng'r of State of Nevada v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nev.*, 339 F.3d 804, 807 (9th Cir. 2003). In *Te-Moak*, Nevada's Sixth Judicial District Court completed an adjudication of the Humboldt River and its tributaries and entered a final decree defining various claimants' rights to the use

of water. *Id.* The United States later acquired five ranches for the purpose of creating an Indian reservation, which were irrigated with water that was subject to the Humboldt Decree. *Id.* at 807–08. Initially, the United States paid water assessments under the decree, and the Tribe allowed the state water commissioner to enter onto the reservation "to ensure that all beneficiaries of the Humboldt Decree were receiving their share of water." *Id.* at 808.

When the United States and the Tribe stopped complying with the requirements of the Decree and state water law, Nevada began contempt proceedings in state court. *Id.* As here, the United States removed under the auspices of 28 U.S.C. §1442. The district court remanded. *Id.* On appeal, the Ninth Circuit affirmed, holding that remand was required because the federal court lacked subject matter jurisdiction. *Id.* at 814. As the Ninth Circuit explained, "Section 1442 … doesn't resolve the jurisdictional issue. The statute merely allows the federal government to remove a case to federal district court; it does not determine whether the court has jurisdiction to hear it." *Id.* at 809.

The court found federal jurisdiction lacking because the prior exclusive jurisdiction doctrine requires that "when a court of competent jurisdiction has obtained possession, custody, or control of particular property, that possession may not be disturbed by any other court." *Id.*, quoting 14 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, Federal Practice and Procedure §3631, at 8 (3d ed. 1998). "[W]here the jurisdiction of the state court has first attached, the federal court is precluded from exercising its jurisdiction over the same *res* to defeat or impair the state court's jurisdiction." *Id.* at 810, *quoting Kline v. Burke Constr. Co.*, 260 U.S. 226, 229 (1922). In other words, when a court enters a decree, it maintains exclusive jurisdiction over its administration. *Id.* The provisions of 28 USC §1442 cannot overcome the jurisdictional defect. *See id.* at 809; 16 Fed. Proc., L. Ed. § 40:820.

Similarly, here, the complaint asserts just one claim for relief for enforcement of the Nevada Decree, which was entered in the state adjudication of the waters of Baker and Lehman Creeks and their tributaries. ECF No. 1-1. The United States claims the right to use water under the Decree, in addition to being a claimant in the Decree proceedings through its representative,

16

Clarence Rhodes, who managed the Lehman Caves National Monument, which is now part of the Park. Ex. 2 at p.7 (0029); Ex. 41 (0215-0216); Ex. 42 (0221); Ex. 43 (0223). In its notice of removal, the United States does not assert the basis for the Court's original jurisdiction. Rather, as it did in *Te-Moak*, the United States relies on 28 U.S.C. §1442. *Compare* ECF No. 1 to 339 F.3d at 808.

But just as the Ninth Circuit held in *Te-Moak*, the federal court cannot assert jurisdiction over the administration of a state water decree. *Id.* at 809. The United States is subject to the Decree court's prior exclusive jurisdiction to administer and enforce its decree. *Id.* As a result, this Court lacks subject matter jurisdiction and remand is required. *See* 28 U.S.C. §1447(c).

### C.  A Sovereign Immunity Defense Does Not Confer Federal Jurisdiction

Rather than attempt to demonstrate that the Court has subject matter jurisdiction, the United States' notice of removal cites cases regarding the waiver of sovereign immunity found in the McCarran Amendment, 43 U.S.C. §666. ECF No. 1. According to the United States' faulty reasoning, removal is proper because the case purportedly does not come within the purview of the McCarran Amendment. ECF No. 1 at ¶¶4-5. However, a sovereign immunity *defense* asserted by the United States does not confer jurisdiction on this Court. *See Caterpillar*, 482 U.S. at 393; *Oklahoma Tax Comm'n v. Graham*, 489 U.S. 838, 841 (1989) ("[I]t has long been settled that the existence of a federal immunity to the claims asserted does not convert a suit otherwise arising under state law into one which, in the statutory sense, arises under federal law."). Because the McCarran Amendment did not disturb the doctrine of prior exclusive jurisdiction, the Court cannot hear the case, regardless of whether the United States asserts sovereign immunity in the state court. *Te-Moak*, 339 F.3d at 814.

### D.  The McCarran Amendment Waives Sovereign Immunity In The Decree Court Under Precisely These Circumstances

Even if sovereign immunity were relevant to the Court's jurisdictional analysis (it is not), and the Court needed to consider the McCarran Amendment when determining whether

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

removal was proper (it does not), this case falls squarely within the waiver established by Congress. The McCarran Amendment waives sovereign immunity in state water rights administration cases, whether the United States was a party to the decree proceedings or acquired decreed rights after the decree was entered. *See United States v. Hennen*, 300 F. Supp. 256, 261 (D. Nev. 1968); *Te-Moak*, 339 F.3d at 813-14.

In *Hennen*, the United State acquired water rights that had been adjudicated under Nevada law many years after the decree was entered. 300 F. Supp. at 258. Shortly thereafter, some of the water users filed a motion in the state decree court to correct the decree nunc pro tunc. *Id.* The United States argued on sovereign immunity grounds that it was not subject to the state court's jurisdiction. *Id.* This Court rejected that argument, holding that a proceeding to correct or modify a state water decree is a suit for the administration of water rights within the meaning of 43 U.S.C. §666(a)(2). *Id.* at 261. As the Court articulated:

> To administer a decree is to execute it, to enforce its provisions, to resolve conflicts as to its meaning, to construe and to interpret its language. Once there has been such an adjudication and a decree entered, then one or more persons who hold adjudicated water rights can, within the framework of 666(a)(2), commence among others such actions as described above, subjecting the United States, in a proper case, to the judgments, orders and decrees of the court having jurisdiction.

*Id.* at 263.

In reaching this conclusion, the Court recited extensive portions of the McCarran Amendment's legislative history to explain why such a waiver was necessary for water rights determination and administration:

> It will be seen that in the Western States irrigation of the lands is essential to successful farming and ranching and failure by a landowner to receive the amount of water vested or adjudicated to him is likely to be fatal to his economic welfare.
>
> *       *       *
>
> 'It is most clear that where water rights have been adjudicated by a court and its final decree entered, or where such rights are in the course of adjudication by a court, the court adjudicating or having adjudicated such rights is the court possessing the jurisdiction to enter its orders and decrees with respect thereto and thereafter to enforce the same by appropriate proceedings. In the administration of and the adjudication of water rights under State laws the State courts are vested with the jurisdiction necessary for the proper and efficient disposition thereof, and by reason of the interlocking of adjudicated rights on any stream system, any order or action affecting one right affects all such rights. Accordingly all water users on a stream, in practically every case, are interested and necessary parties to

18

any court proceedings. It is apparent that if any water user claiming to hold such right by reason of the ownership thereof by the United States or any of its departments is permitted to claim immunity from suit in, or orders of, a State court, such claims could materially interfere with the lawful and equitable use of water for beneficial use by the other water users who are amenable to and bound by the decrees and orders of the State courts. Unless Congress has removed such immunity by statutory enactment, the bar of immunity from suit still remains and any judgment or decree of the State court is ineffective as to the water right held by the United States. Congress has not removed the bar of immunity even in its own courts in suits wherein water rights acquired under State law are drawn in question. The bill (S. 18) was introduced for the very purpose of correcting this situation and the evils growing out of such immunity.

\*     \*     \*

'The committee is aware of the fact, as shown by the hearings, that the United States Government has acquired many lands and water rights in States that have the doctrine of prior appropriation. When these lands and water rights were acquired from the individuals the Government obtained no better rights than had the persons from whom the rights were obtained.

'Since it is clear that the States have the control of the water within their boundaries, it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the State, if there is to be a proper administration of the water law as it has developed over the years.
'The committee is of the opinion that there is no valid reason why the United States should not be required to join in a proceeding when it is a necessary party and to be required to abide by the decisions of the Court in the same manner as if it were a private individual.'

*Id.* at 261–63, quoting Senate Report No. 755, 82d Congress, 1st Session. Pages 2-6.

This Court's holding and the underlying rationale for the McCarran Amendment expressed by Congress are squarely applicable here. The United States, through its manager of Lehman Caves National Monument (which is now part of the Park) was named as a claimant in the Decree and therefore was a party to the Decree proceedings. Ex. 2 at p.7 (0029); Ex. 41 (0215-0216); Ex. 42 (0221); Ex. 43 (0223). The Decree proceedings following a comprehensive adjudication conducted by the Nevada State Engineer pursuant to Nevada law. Ex. 2, pp 4-6 (0017-0019); Act of Mar. 22, 1913, ch. 140, 1913 Nev. Stat. 192 (codified as amended at Nev. Rev. Stat. ch. 533). The cases cited by the Defendants are therefore inapposite and do not alter the conclusion that a waiver of sovereign immunity must be found here.

Even if not deemed a party to the Decree proceedings through its agent, the United States has asserted repeatedly in filings with the Nevada State Engineer that it has the right to use the water adjudicated under the Decree. Ex. 3 (0056); Ex. 43 (0223-0228). It claims to have acquired that right in 1934, the same year the Decree was first entered. Ex. 43 (0225). Whether the United States was a party to the Decree proceedings or acquired its rights thereafter, it is subject to the Decree court's ongoing administration and has waived its sovereign immunity for that purpose. 43 U.S.C. §666(a)(2); *see Hennen*, 300 F. Supp. at 261. As a result, to the extent the Court determines it needs to analyze sovereign immunity in the context of this motion, a waiver must be found here and remand to the Decree court is required. Allowing the United States to evade the Decree court's enforcement of the Decree would frustrate the purpose of the McCarran Amendment's waiver of sovereign immunity.

**E.  An Award Of Fees And Costs To Plaintiffs Is Warranted**

The Court may order the defendant to pay plaintiff its "just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 USC §1447(c). To prevent paying the plaintiffs' fees and costs, the removing party must have "an objectively reasonable basis for removal." *Martin v. Franklin Capital Corp.*, 546 US 132, 136 (2005). The Court may consider a fee and cost application even after it remands. *Moore v. Permanente Med. Grp., Inc.*, 981 F.2d 443, 445 (9th Cir. 1992) (holding, that because "[t]he award of fees pursuant to section 1447(c) is collateral to the decision to remand," a district court retains jurisdiction after the remand to entertain Plaintiffs' motion for attorney's fees). Because the Defendants had no reasonable basis for removal, an award of fees and costs to Plaintiffs is appropriate here. Upon further order of the Court, Plaintiffs are prepared to submit the necessary supporting evidence of the fees and costs they incurred as a result of the removal.

///

///

///

///

## IV.     Conclusion

Because the state court has primary exclusive jurisdiction, the Court lacks subject matter jurisdiction over this case. Remand is required. Plaintiffs respectfully request an award of fees and costs in their favor.

DATED:  April 6, 2021

LEONARD LAW, PC

  /s/ Debbie Leonard
Debbie Leonard (#8260)
Leonard Law, PC
955 South Virginia Street, Suite 220
Reno, Nevada 89502
(775) 964-4656
debbie@leonardlawpc.com

*Attorney for Plaintiffs*

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that I am an employee of Leonard Law, PC and that I caused to be electronically filed on this date a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically e-serve participating counsel. Any counsel listed below who are not registered for e-serve will be served by first-class mail:

> CHRISTOPHER CHIOU
> Acting United States Attorney
> District of Nevada
> GREG ADDINGTON
> Assistant United States Attorney
> 400 South Virginia Street, Suite 900
> Reno, Nevada 89501
>
> JEAN E. WILLIAMS
> Acting Assistant Attorney General
> U.S. Department of Justice
> DAVID L. NEGRI, Trial Attorney
> Environment and Natural Resources Division
> c/o U.S. Attorney's Office
> 1290 West Myrtle Street, Suite 500
> Boise, Idaho 83702

DATED:  April 6, 2021

/s/ Tricia Trevino

Leonard Law, PC
955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com