Debbie Leonard (#8260)
Leonard Law, PC
955 South Virginia Street, Suite 220
Reno, Nevada 89502
(775) 964-4656
debbie@leonardlawpc.com

*Attorney for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| BAKER RANCHES, INC., a Nevada corporation, DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE, as Co-Trustees of the DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE FAMILY LIVING TRUST, dated January 31, 2007; ZANE JORDAN; and JUDEE SCHALEY,<br><br>Plaintiffs,<br><br>v.<br><br>DEB HAALAND, in her official capacity as Secretary of the United States Department of the Interior, the UNITED STATES DEPARTMENT OF THE INTERIOR, SHAWN BENGE, in his official capacity as Acting Director of the National Park Service, the NATIONAL PARK SERVICE, and JAMES WOOLSEY, in his official capacity as Superintendent of the Great Basin National Park,<br><br>Defendants. | 3:21-CV-00150-LRH-WGC<br><br><br>**MOTION FOR<br>ORDER TO SHOW CAUSE<br>WHY DEFENDANTS SHOULD NOT BE<br>HELD IN CONTEMPT FOR<br>VIOLATING COURT DECREE** |

Plaintiffs BAKER RANCHES, INC. ("Baker Ranches"), DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE, as Co-Trustees of the DAVID JOHN ELDRIDGE AND RUTH ELDRIDGE FAMILY LIVING TRUST, dated January 31, 2007; ZANE JORDAN; and JUDEE SCHALEY (collectively, "Plaintiffs"), by and through their undersigned attorney, Debbie Leonard of Leonard Law, PC, move the Court for an Order to Show Cause why Defendants should not be held in contempt of Court for violating the decree of the Seventh

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1
2
3
4

Judicial District Court of Nevada, which sets forth the relative rights to the waters of Baker and Lehman Creeks. This motion is based upon the following points and authorities, the accompanying Appendix of declarations and exhibits, the pleadings and papers in the Court's files, and such other matters as the Court may wish to consider.

5

**POINTS AND AUTHORITIES**

6

## I.   Introduction

7
8
9
10
11
12

Defendants are violating the Seventh Judicial District Court of Nevada's decree, which adjudicated and determined the relative rights of the waters of Baker and Lehman Creeks in White Pine County, Nevada ("the Decree"). Defendant National Park Service ("NPS") is diverting and using water without a valid water right, interfering with Plaintiffs' senior decreed rights, and preventing Plaintiffs from ensuring that the creek water reaches their downstream points of diversion.

13
14
15
16
17
18
19

Because of NPS's conduct, starting in July 2020, usable flows in Baker Creek never reached the boundary of Great Basin National Park, resulting in irreparable harm to Plaintiffs. Currently, significant portions of the Plaintiffs' decreed rights are not reaching their points of diversion at a critical time when flows from the mountains are needed to sufficiently wet Plaintiffs' fields and pastures at the beginning of the growing season. A contempt order is warranted to stop Defendants' violations of the Decree and ensure Plaintiffs are able to exercise their senior decreed rights.

20
21
22
23
24

In the concurrently filed motion to remand, Plaintiffs have demonstrated that the state court has primary exclusive jurisdiction to administer and enforce its Decree, and this Court lacks subject matter jurisdiction. To the extent the Court determines it has jurisdiction, Plaintiffs request that it enter an order enforcing the Decree, holding the Defendants in contempt for violating it, and awarding Plaintiffs their associated costs and fees.

25

## II.   Factual Background

26

### A.  The Baker-Lehman Decree Issued By The State Court

27
28

Plaintiffs own, hold, maintain, and are the lawful successors in interest to water rights that were adjudicated and decreed pursuant to the Findings of Fact, Conclusions of Law and

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Decree entered on October 16, 1934, as corrected nunc pro tunc on February 23, 1950, in Case No. 2874, *In the Matter of the Determination of the Relative Rights in and to the Waters of Baker and Lehman Creeks and Tributaries in the County of White Pine, State of Nevada* ("the Decree") to irrigate farming and grazing lands in White Pine County, Nevada, as follows:

    a. Plaintiff Baker Ranches, Inc.'s share of Proof of Appropriation No. 01066 is appurtenant to 1,751.87 acres and has a priority date between 1872 to 1904.

    b. Plaintiff David John Eldridge and Ruth Eldridge Family Living Trust's share of Proof of Appropriation No. 01066 is appurtenant to 8.8 acres and has a priority date of 1872.

    c. Plaintiffs Zane Jordan's and Judee Schaley's share of Proof of Appropriation No. 01066 is appurtenant to 7.13 acres and has a priority date of 1876.

Ex. 1, Declaration of Craig Baker ("Craig Baker Decl.") ¶¶5-7 (0002-0003)[1]; Ex. 2, Baker-Lehman Decree (0014-0054); Ex. 39, Declaration of Judee Schaley ("Schaley Decl.") ¶3 (0211); Ex. 40, Declaration of Ruth Eldridge ("Eldridge Decl.") ¶4 (0213).

Defendant National Park Service ("NPS") claims to be the successor-in-interest to two water rights adjudicated under the Decree: Proofs of Appropriation Nos. 01065 and a portion of No. 01066. Proof of Appropriation No. 01065 is for irrigation of 7.5 acres and has a priority date of 1890. Ex. 2 (0014-0054). The claimant listed in the decree for Proof 01065 is Clarence ("CT") Rhodes, who managed the Lehman Caves National Monument on behalf of the United States at the time the Proof was filed. Ex. 2 at p.7 (0020); Ex. 41 (0215-0216); Ex. 42 (0221). Defendant United States Department of the Interior filed an application to change the point of diversion, place of use and manner of use of Proof 01065 for domestic, recreation and fire protection purposes for use at the Lehman Caves Visitor Center, which was approved by the Nevada State Engineer on April 7, 1964. Ex. 3, Permit 20794 (0056-0057). The records of the Nevada Division of Water Resources under 01065 contain a filing by the United States

_____

[1] The appendix of exhibits page numbers follow each exhibit reference pursuant to LR IA 10-3(c).

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Department of the Interior that claimed the use under that proof existed "since prior to the adjudication." Ex. 43, Change Appl. for V01065 at 2 (0224).

> The United States claims the right to the full appropriation by virtue or a deed from the Commissioners of White Pine County to the United States or America, Department of Agriculture, dated September 18, 1934, and recorded in Book 118, pages 221-222 of the    records or the county Recorder, which conveyed … "the waters or Cave Spring, evidenced by proof of appropriation No. 01065 on file in the office of the State     Engineer, State of Nevada."

Ex. 43, p. 3 (0225). NPS's share of Proof of Appropriation No. 01066 is for irrigation of 25 acres just north of the town of Baker and has a priority date of 1904. Ex. 2 at p.19 (0031).

The Decree provides, inter alia, the following:

> That the Judgment and Decree to be hereinafter entered should provide that each and every water user of the Baker and Lehman Creeks stream system and its tributaries, and each of agents, attorneys, servants, employees, and their respective successors in interest, and each and every person acting in aid or assistance of said parties, or either or any of them, be perpetually enjoined and restrained as follows, to-wit:

> (a) From at any time diverting or using or preventing or obstructing the flow, in whole or in part, in or along its natural channel, of any of the water or said stream system, except to the extent and in the amount and in the manner and at the time or times fixed by this Decree and allocated, allowed, prescribed, and determined to such parties respectively, and as may be allowed in the permits which have been or may hereafter be granted by the State Engineer of the state of Nevada.

> (b) From diverting from the natural channel and from using any of the said water for irrigation or any other purpose in excess of the amount specifically allotted to or for said party herein and fixed by this Decree, or in excess of the specified allotment under such permit or permits so heretofore granted or which may hereafter he granted by said State Engineer.

> (c) From diverting from the natural channel and from using any of the said waters in any other manner or for any other purpose or purposes or upon any other land or lands or in any other amount than as provided and prescribed by the terms or this Decree or by any such permit so granted by said State Engineer.

> (d) From diverting from the natural channel and from using any of the said water at any other time or times than as specified and provided by the terms of this Decree or by any such permit so granted by the said State Engineer.

> (e) From from in any manner meddling with, opening, closing, changing, injuring, or interfering with any headgates, weirs, water-boxes, flumes, or measuring devices, or either or any of them, placed, installed, established, or approved by said State Engineer or by his authority or direction, unless such act be done with the permission or authority of the water

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1
2
3

> commissioner or commissioners on said stream system during the period
> of his regulation or control of said water, or, if not done during such
> period of his control, then by virtue or the allowances, authority, terms,
> and provisions of this Decree or by a permit so granted by said State
> Engineer.

4   Ex. 2 at pp. 26-27 (0038-0039). The Decree arose from the Nevada State Engineer's Final

5   Order of Determination of the relative rights to Baker and Lehman Creeks following an

6   adjudication conducted pursuant to Nevada law. Ex. 2 at p.4-6 (017-019); Act of Mar. 22,

7   1913, ch. 140, 1913 Nev. Stat. 192 (codified as amended at Nev. Rev. Stat. ch. 533).

8   **B.  Plaintiffs' Rights Are Senior to Any Rights Asserted by NPS**

9   What is now the Great Basin National Park ("the Park") was previously managed by

10  the United States Forest Service as part of the Nevada National Forest, which was withdrawn

11  from the public domain and created on February 10, 1909. *See* History of the Toiyabe

12  National Forest: A Compilation, available at

13  https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev3_042121.pdf at p.128. The

14  Nevada National Forest was later incorporated into the Humboldt National Forest in 1957. *Id.*

15  The Park was created on October 27, 1986 by Public Law 99-565 ("the GBNP

16  Enabling Act"), which indicated that withdrawal of lands for the Park was "subject to valid

17  existing rights." https://www.congress.gov/99/statute/STATUTE-100/STATUTE-100-

18  Pg3181.pdf; 16 U.S.C. §410mm-1(d). The GBNP Enabling Act makes clear that creation of

19  the Park "shall [not] be construed to establish a new express or implied reservation to the

20  United States of any water or water-related right with respect to" the lands withdrawn for the

21  Park, and "[n]o provision of this Act shall be construed as authorizing the appropriation of

22  water, except in accordance with the substantive and procedural law of the State of Nevada."

23  16 U.S.C. §410mm-1(h).

24  Baker and Lehman Creeks originate in and flow through the Park. Ex. 4,

25  Demonstrative Maps (0059-0064); Ex. 1, Craig Baker Decl. ¶8 (0003). The point at which

26  the Plaintiffs divert water from Baker and Lehman Creeks is downstream of the Park

27  boundary and outside the Park. Ex. 1, Craig Baker Decl. ¶8 (0003). The places of use of the

28  Plaintiffs' water rights are in White Pine County, Nevada, outside the Park boundary. *Id.* The

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

availability of water flows to satisfy Plaintiffs' decreed water rights depends on the unobstructed, undiverted and unconsumed flow of water in Baker Creek and Lehman Creek through the Park. *Id.*

### C. Plaintiffs and Their Predecessors Engaged in Activities to Ensure the Free Flow of Their Senior Priority Water To Their Points of Diversion and to Capture Water That Would Otherwise be Lost into Caves and Sinks

#### 1. Actions to Control Flows and Prevent Water Losses

The historical record and first-hand accounts indicate that Plaintiffs' predecessors took actions starting more than 100 years ago to control the flows of Baker Creek and to salvage Baker Creek water to prevent it from being lost into sinks, cracks and caves along the channel. Ex. 1, Craig Baker Decl. ¶¶9-10, 12, 14-16, 49-52 (0003-0005, 0010-0011). Two particular features into which water can be lost are known as Ice Cave and Sink, which is in the Baker Creek Narrows. *Id.* at ¶11 (0004); Exs. 29-30, 37, Photos of Sink (0154-0157, 0203-0206). Because high flows cause rocks and debris to move within the channel, after the spring run-off, Plaintiffs and their predecessors regularly entered into the Baker Creek channel, using machinery and by hand, to clear channel obstructions, move rocks and debris and block the openings of the caves, cracks and sinks located in the Baker Creek Narrows to prevent the loss of their decreed water rights. Ex. 1, Craig Baker Decl. ¶¶9-15, 17, 28 (0003-0005, 0007).

Daisy Gonder, a previous owner of a portion of V01066, testified under oath regarding the historical annual practice of the Baker Creek water users to divert water away from the caves to maximize flows and push high water during the spring run-off towards the caves to prevent downstream flooding.[2] Ex. 5, Excerpts of Daisy Gonder Depo. Trans. (0066-0074). Ms. Gonder testified:

> I personally know that my husband and I and Fred Baker and then Dean Baker went up there numerous times of the year to control that water in Baker Creek.

\* \* \*

_____

[2] This latter practice is no longer necessary because Plaintiffs now have heavy machinery that was not available in the past to spread water during high flows and prevent flooding of their ranches. Ex. 1, Craig Baker Decl. ¶15 (0004-0005).

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1
2
3
4

> I went up with my husband. He was approached by Mr. Fred Baker to come and help divert the water, the high water that was coming down, and literally what you do is have your boots on and you get in the creek and you move a few rocks to turn it into a hole so it lessens the amount of water coming down the hill…. ***When the water -- when the high water went down, that's when they went up and turned the water back into the creek***.

5
6
7
8
9

Ex. 5, Daisy Gonder Depo. Trans. at 14:2-20:10 (emphasis added) (0067-0076). The first time Ms. Gonder participated in this practice was 1966, twenty years before the Park was created. *Id.* at 14:13-15 (0067). She moved the Baker Creek water every year, even after the Park was established, and no one ever prevented her from doing that work. *Id.* at 18:7-19:25 (0071-0072).

10
11
12
13
14
15
16
17
18
19
20
21

Craig Baker has gone to numerous locations along Baker Creek to move rocks and debris in order to maximize the flows down Baker Creek channel to Baker Ranches' points of diversion, as needed. Ex. 1, Craig Baker Decl. ¶¶13, 28 (0004, 0007). This included moving rocks to block and divert water away from sinks, cracks in the canyon wall, and cave openings that are located along the Baker Creek channel, particularly in Baker Creek Narrows and near Grey Cliffs Campground. *Id* at ¶9 (0003). Fred Baker (grandfather) and Dean Baker (father) did the same thing. *Id.* Craig Baker has his grandfather's journal entries that describe these activities, and his father described them to Craig as well. *Id.* at ¶10 (0004); Ex. 6 (0076-0083). Prior to NPS preventing him from doing so, Craig Baker went up to Baker Creek Narrows nearly every year to ensure that water was not going into the sinks, cracks and caves and to move rocks and obstructions, as needed, to maximize the flow in the channel. Ex. 1, Craig Baker Decl. at ¶17 (0005).

22
23
24
25
26
27

Dean Baker told Craig numerous times that, in the early 1960's, upon permission from the Forest Service, he drove a bulldozer into Baker Creek to clean and straighten the creek channel from Baker Creek Campground through the Narrows. *Id.* at ¶14 (0004). He continued to use heavy equipment from the 1960's through the 1980's to clean and straighten the creek channel or to divert water into or out of the caves. *Id.* The location where this occurred is depicted in Ex. 4(C) (0061).

28

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1          **2.  Diversion Structures**

2          There are obvious manmade dams and ditches inside the Park that clearly show a long

3    history of efforts prior to the land being withdrawn from the public domain to ensure that the

4    full flow of Baker Creek reaches the points of diversion. Ex. 1, Craig Baker Decl. ¶¶16, 49-51

5    (0005, 0010-0011). The original 1872 Baker Creek point of diversion established by Baker

6    Ranches' predecessor was inside what is now the Park boundary just downstream of the

7    Narrows and is depicted in Ex. 4(B) (0060). Ex. 1, Craig Baker Decl. ¶49 (0010); Ex. 7

8    (0085-0088). This point of diversion is described in documents recorded in the White Pine

9    County Recorder's office in 1887 by George Baker and Willard Burbank. *Id.*

10         A photo that dates back to the 1920's shows a significant diversion structure in the

11   Narrows adjacent to Sink. Ex. 1, Craig Baker Decl. ¶16 (0005); Ex. 8 (0090-0092). This

12   photo appeared in a pamphlet that was produced by the nearby Meeks Dude Ranch. *Id.*

13   Apparent in the foreground are boards across the creek that are controlling the flow. *Id.* There

14   are still the remnants of fiberboards, plywood and old diversion structures at various locations

15   in Baker Creek narrows. Ex. 1, Craig Baker Decl. ¶16 (0005). In the files of the Division of

16   Water Resources, a report drafted by Assistant Engineer Seymour Case referenced an "old

17   weir up in the canon" of Baker Creek that was observed during a September 10, 1912 field

18   investigation. *Id.* at ¶50 (0010-0011); Ex. 9 (0094-0095).

19         Moreover, Nevada State Engineer Permit 109 was issued to Baker Ranches'

20   predecessors in 1906 to build dams in the Narrows for the purpose of producing power. Ex. 1,

21   Craig Baker Decl. ¶51 (0011); Ex. 10 (0097-0100). Approximately 200 tons of material was

22   moved for construction of the proposed dam, further demonstrating human structures and

23   activities in the Narrows to make beneficial use of Baker Creek's waters. Ex. 1, Craig Baker

24   Decl. ¶51 (0011); Exs. 10-12 (0096-0104). As is clear from this evidence, some of these

25   practices predated when the lands that are now in the Park were withdrawn from the public

26   domain to create the Nevada National Forest. Exs. 7-12 (0084-0095, 0096-0104). Those that

27   post-dated withdrawal of those lands from the public domain were performed without

28

objection from the Forest Service or the Park Service until 2014. Ex. 1, Craig Baker Decl. ¶¶13-14, 17, 28, 52 (0004-0005, 0007, 0011); Ex. 5, Daisy Gonder Depo. Trans. (0066-0074).

### D.  NPS Has Prevented Plaintiffs From Directing the Flow of Water to Their Points of Diversion And Will Not Take The Steps Necessary To Ensure Creek Flows Reach Plaintiffs' Points Of Diversion

Starting in 2012, Defendants threatened Plaintiffs with law enforcement action should they enter into the Park to remove obstructions to flow and to salvage their decreed water rights from being lost into caves, cracks and sinks. Ex. 1, Craig Baker Decl. ¶21 (0006). Specifically, on or about April 7, 2012, Craig Baker noticed that the flow at the Parshall flume, which is located below the confluence of Baker Creek and Lehman Creek, was uncharacteristically low for that time of year. *Id.* at ¶18 (0005). He discovered that the Baker Creek channel was dry at the Pole Canyon bridge. The locations of the Parshall flume and Pole Canyon bridge are shown on Ex. 4(F) (0064). *Id.* at ¶¶18-19 (0005). Photos taken that day are attached as Ex. 13 (0106-0108). The location of the confluence is shown in Exs. 4(A) and 4(F) (0059, 0064).

With his brother Dave, Craig walked the creek upstream and found that all the water was flowing into Sink. Craig Baker Decl. ¶20 (0005). It appeared as if rocks had been placed in the stream to divert water into Sink. *Id.* Craig estimated that approximately 2-3 cfs, which at the time was the entire flow of Baker Creek, was being lost into Sink. *Id.* The location of Sink is depicted in Ex. 4(A) (0059).

Craig and Dave started to move rocks and other material to direct the water away from Sink and back down the channel. *Id.* at ¶21 (0006). After they had been working for about an hour, a Park Service law enforcement officer appeared and took them to the law enforcement office. *Id.* After being briefly detained, they were driven back to where they had been working. *Id.* Then-Superintendent Andy Ferguson allowed them to finish their work, but thereafter, a new superintendent, Steven Mietz, informed Craig in 2014 that future efforts to maintain the flow in the Baker Creek channel would not be permitted. *Id.* at ¶¶21, 23 (0006).

Flow data from around the 2012 incident, collected by both NPS and Craig Baker, show that there was no flow in Baker Creek below Sink, and the flow above Sink was 2.76

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

cfs, all of which was lost into Sink. *Id.* at ¶¶24-25 (0006); Exs. 15 and 16 (0111-0114). These data demonstrate that Baker Ranches was without its decreed Baker Creek water when all of the water was entering Sink. Ex. 1, Craig Baker Decl. ¶26 (0006-0007). After Craig and Dave Baker's work on April 7, 2012 to redirect the water away from Sink and into the channel, it took 20 days for the water to finally reach Baker. Ex. 1, Craig Baker Decl. ¶22 (0006); Ex. 14 (0110). No subsequent superintendent has authorized Plaintiffs to enter onto Park property to remove obstructions, block the sink and cave openings, and otherwise ensure the flow remains in the channel for delivery to Plaintiffs' points of diversion. Ex. 1, Craig Baker Decl. ¶¶23, 27 (0006-0007).

The problem of water being lost into Sink is particularly acute during dry years. As of July 2020, almost all of Baker Creek's flow again was being lost into Sink, such that Plaintiffs were deprived of their decreed rights. *Id.* at ¶27 (0007). Photos from September 2020 are attached as Ex. 17 (0116-118). *Id.* at ¶27 (0007). They show that Baker Creek was dry at the confluence with Lehman Creek. *Id.* With 2021 proving to be another dry year, Plaintiffs will likely not get their decreed Baker Creek water after the spring run-off. Ex. 1, Craig Baker Decl. ¶61 (0012); Ex. 39, Schaley Decl. ¶6 (0211); Ex. 40, Eldridge Decl. ¶7 (0213).

### E.   NPS Activities That Are Consuming Plaintiffs' Water Rights And Violating The Decree

In addition to preventing Plaintiffs from exercising their water rights, NPS is also diverting and consuming water from Baker and Lehman Creeks without a water right.

#### 1.   Diversion of Water for Campgrounds Without a Water Right

NPS operates campgrounds along Lehman Creek and Baker Creek that have no associated water rights. Ex. 1, Craig Baker Decl. ¶30 (0007); *see* Ex. 2 (0014-0054). Nevertheless, Defendants have diverted tributary water from Baker and Lehman Creeks for use at the campgrounds. Ex. 1, Craig Baker Decl. ¶30 (0007). The approximate locations of these unlawful diversions are depicted in Exs. 4(E) and 4(F) (0063-0064). This water belongs to Plaintiffs, and Defendants' unlawful diversions violate the Decree. *See* Ex. 2 (0014-0054).

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

### 2.  Placement of, And Failure to Clear, Debris and Rocks

NPS has engaged in decades of unnatural fire suppression activities, resulting in the proliferation of vegetation and woody debris in Baker and Lehman Creeks and their tributaries that did not exist at the time Plaintiffs' predecessors established their decreed rights. Ex. 1, Craig Baker Decl. ¶31 (0008). This is confirmed by photographic evidence. Exs. 8, 19-21, 24-25, 31-33, 35 (0090-0092, 0121-0129, 0137-0141, 0158-0175, 0181-0195). The debris dams the natural channel, causing water to be diverted and side channels to develop, which in turn causes evaporation and loss of Plaintiffs' decreed rights and prevents the full amount of Plaintiffs' decreed rights from reaching their points of diversion. Ex. 1, Craig Baker Decl. ¶¶35-37, 39 (0008-0009); Exs. 24-25, 27, 31-33 (0137-0141, 0150, 0158-0175).

NPS has published numerous documents that concede its management activities have dramatically altered the landscape. Ex. 1, Craig Baker Decl. ¶31 (0008); Exs. 21-23 (0126-0136). For example, an historical photo from the early 1920s in the Park's Resource Management Newsletter depicts cliffs at the mouth of the Baker Creek Narrows about 200 yards above Sink. Ex. 1, Craig Baker Decl. ¶32 (0008); Ex. 21 (0127-0129). NPS describes the landscape as "scattered trees on a primarily sagebrush landscape." Ex. 21 (0127-0129). NPS compares that historical photo to one from 2005 in the same location, which NPS acknowledges "shows a large increase of pinyon and juniper trees." *Id.* NPS takes responsibility for this alteration, noting "it is human's suppression of fire that is partially responsible for some of these recent changes. Without fire these communities become choked with vegetation, and soon pinon and juniper trees begin to invade." *Id.* According to NPS, the "ecological implications of this change are profound." *Id.*

The Park's Natural Resource Condition Assessment from 2016 shows that approximately 20 fires have ignited in the Baker Creek basin since 1959 but only one fire had burned since 1980. Ex. 1, Craig Baker Decl. ¶33 (0008); Ex. 22 (0131-0132). No fire has been allowed to burn through the Baker Creek Narrows or up the creek. Ex. 22 (0131-0132. The Great Basin National Park's 2010 Fire Management Plan indicates that: (1) fire was a major ecological factor in the area for the past several hundred years; (2) through tree coring

analysis, it has been determined that the mean historical fire interval in the area was 20 years, depending on elevation; and (3) a century of fire suppression has degraded riparian communities by shifting the landscape away from diverse sage grassland communities to low diversity woody plant communities with heavy fuel loading. Ex. 1, Craig Baker Decl. ¶34 (0008); Ex. 23 (0134-0136).

Because of NPS's unnatural fire suppression, the streams coming out of the Park are jammed with dead trees and woody debris, some of which is diverting water into Sink. Ex. 1, Craig Baker Decl. ¶35 (0008-0009); Exs. 24-25, 31-33, 35 (0137-0141, 0158-0175, 0181-0195). It is difficult to even access the streams through the vegetation, and the unnatural vegetation that NPS has allowed to overtake the landscape is consuming water to which Plaintiffs have priority. Ex. 1, Craig Baker Decl. ¶¶35-36, 39 (0008-0009). This is very different from the historical pictures. Exs. 8, 19, 21 (0090-0092, 0122, 0127-0129). Even when NPS engaged in campground renovation and fuels-reduction projects, it allowed downed woody debris to choke Baker and Lehman Creeks. Ex. 1, Craig Baker Decl. ¶47 (0010). Photos demonstrate that chainsaw-cut tree parts are readily identifiable in the creeks and debris dams. *Id.*; Exs. 24-25, 31-32, 35 (0137-0141, 0158-0170, 0181-0095).

Park visitors routinely build rock dams in Baker and Lehman Creeks, often near the campgrounds. Ex. 1, Craig Baker Decl. ¶46 (0010). These dams impede and spread the creek flow. *Id.* Photos of such rock dams in Baker Creek are attached as Ex. 36 (0197-0201). Photos of rock dams in Lehman Creek adjacent to the campgrounds are attached in Ex. 34 (0177-0179).

The obstructions described in this Motion and the attached exhibits prevent the water from freely flowing down the channel, divert water into Sink, Ice Cave, and other cracks, caves and sinks in the Baker Creek channel, and spread the water and cause it to leave the Baker and Lehman Creek channels and never return. Ex. 1, Craig Baker Decl. ¶48 (0010). Due to the debris that has accumulated, Craig Baker estimates that the Baker Creek stream bed in the area of Sink has risen by three feet in the last few years. *Id.* at ¶38 (0009). When water backs up against debris during high flows, the creeks spread or braid, rather than stay in

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-864-4656 | Debbie@leonardlawpc.com

their channel, causing the loss of Plaintiffs' water rights to evaporation and seepage. *Id.* at ¶39 (0009); Exs. 18, 27, 32-33 (0120, 0150, 0167-0175).

### 3. Planting of Riparian Vegetation

In locations where the debris has caused Lehman Creek to form side channels, NPS recently planted riparian vegetation. Ex. 1, Craig Baker Decl. ¶¶42, 44 (0009-0010). As Craig Baker recalls, debris dams caused side channels to form from Lehman Creek in 2010. *Id.* at ¶40 (0009). When the Lehman Creek braiding occurred in 2010, Craig Baker restored the water to its original channel. However, the Park Service then put the water into the braided channels again. *Id.*

High flows in 2019, a year that had a 180% snowpack, created rock and debris jams that further split the channels. *Id.* at ¶41 (0009). Photos of these rock and debris jams are in Ex. 32 (0168-0170). Photos of other rock and debris dams in Lehman Creek are in Ex. 31 (0159-0166). The location of the braiding is depicted in Ex. 4(E) (0063).

The Park Service planted vegetation next to one of these braids (labeled the "Second Braid" in Ex. 4(E)) (0063). Ex. 1, Craig Baker Decl. ¶42 (0009). Photos of these plantings are shown in Ex. 26 (0143-0148). Downstream of the debris jams that create this braiding, water no longer flows in the main Lehman Creek channel. Ex. 1, Craig Baker Decl. ¶43 (0009). Photos of the dry historic Lehman Creek channel are shown in Exs. 27 and 33 (0150, 0172-0175). The Park Service also placed vegetation cuttings in the Second Braid. Ex. 1, Craig Baker Decl. ¶44 (0009-0010); Ex. 28 (0152-0153). When water is in the Second Braid, these cuttings slow and spread the water, making it less likely that the water will return to the main Lehman Creek channel. Ex. 1, Craig Baker Decl. ¶44 (0009-0010). The location of the dry Lehman Creek channel, the braids and the Park Service's plantings are shown in Ex. 4(E) (0063). Ex. 1, Craig Baker Decl. ¶45 (0010).

NPS's newly planted riparian vegetation and side channels on Lehman Creek are consuming Plaintiffs' senior decreed rights and preventing Plaintiffs' decreed rights from reaching Plaintiffs' points of diversion. *Id.* at ¶¶44, 48 (0009-0010).

1

### F.  Critical Need For Expedited Relief

The foregoing actions by the Defendants are creating a dire situation for Plaintiffs. The early-season irrigation water from the beginning of the mountain run-off is critical to the Plaintiffs' ranch because it is used to water the meadows so they are wet for the spring growth that starts around the beginning of April. Ex. 44, Declaration of Tom Baker ("Tom Baker Decl.") (0237-0238). This watering fills the soil moisture profile, which creates the spring growth of the grasses. *Id.* at ¶4 (0237). These meadows will not be irrigated again until the high runoff water comes out of the mountains in late May early June. *Id.* Because of the decreased flows in Baker and Lehman Creeks, Plaintiffs have missed out, and continue to miss out, on a significant percentage of the early growth of the cool season grasses. *Id.* at ¶5 (0237).

Baker Ranches starts irrigating the field crops on the first of April. *Id.* at ¶6 (0237). The first crop of the year is the most valuable and highest yielding of the season. *Id.* It will account for approximately 60% of the annual crop revenue. *Id.* With forages, Baker Ranches typically gets 3-4 crops per year. *Id.* In addition to the value of the crop, the soil moisture profile of the crop land is important. *Id.* at ¶7 (0237). If June starts with dry soils, the ranches will be behind on water, which can cause a reduction in yield for the rest of the season. *Id.*

The annual crops that Baker Ranches grows must be planted and irrigated in April and May. *Id.* at ¶8 (0237). The cool season crops like barley and oats grow better in the spring than in the heat of the summer. *Id.* This also allows the crop to be finished growing by the beginning of July when the high-water flow from the mountain is generally ending. *Id.* Baker Ranches also grows corn to feed its cattle, which must be planted in the beginning of May. *Id.* at ¶9 (0238). Baker Ranches' cropping systems and management of the natural meadows have been adapted to make efficient use of its decreed water and care for the ranch's resources. *Id.* at ¶10 (0238). The drying up of Baker Creek has caused significant problems for Baker Ranches trying to keep the natural resources of the ranch productive and healthy and exacerbates the drought conditions. *Id.* at ¶11 (0238). In addition to the significant economic

14

impacts, the inability to fully wet the meadows and fields in the early season will have possible long-term impacts to their health and productivity. *Id.* at ¶12 (0238).

### III.   Legal Argument

#### A.  Standard for Contempt Order

"Civil contempt ... consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *In re Dual–Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir.1993). "The party alleging civil contempt must demonstrate that the alleged contemnor violated the court's order by 'clear and convincing evidence,' not merely a preponderance of the evidence." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014). The appropriate remedy against one who violates a water decree is contempt. *S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nevada v. Sixth Jud. Dist. Ct. ex rel. Cty. of Humboldt*, 116 Nev. 805, 810, 7 P.3d 455, 458 (2000) (holding that the state decree court "has the authority to hold in contempt those who interfere with or frustrate the … the administration of the … Decree"); *Brooks v. United States*, 119 F.2d 636, 646 (9th Cir. 1941) (affirming district court's contempt order for violation of water decree); *Marks v. Hilger*, 262 F. 302, 306 (9th Cir. 1920) (affirming district court's order holding in contempt water user who took water in excess of his decreed rights).

#### B.  Defendants' Conduct Violates The Decree

##### 1.  NPS Is Diverted and Consuming Water For Which It Lacks a Water Right

The Decree requires that any party be "perpetually enjoined and restrained" from "diverting or using" water in any way contrary to decreed rights. Ex. 2 at p.26 (038). NPS's diversion of water for the campgrounds without a water right is unlawful and violates the express language of the Decree. *See id.* Likewise, NPS's planting of riparian vegetation constitutes an unlawful diversion of water. *See R.J.A., Inc. v. Water Users Ass'n of Dist. No. 6*, 690 P.2d 823, 826 (Colo. 1984) (Water that is transpired by riparian plant life is tributary to a stream and therefore subject to the rules of prior appropriation). Similarly, NPS dramatic

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

alteration of the landscape through decades of fire suppression has caused debris and obstructions to exist in the stream channel that did not exist when Plaintiffs' predecessors made their prior appropriations. *Reagle v. Square S. Land & Cattle Co.*, 296 P.2d 235, 236 (Colo. 1956) ("an appropriator of water from a stream may insist that conditions on the stream remain substantially as when he made his original appropriation and he may prevent interference therewith by others to his detriment"). The debris should be cleared to prevent Plaintiffs' senior rights from being diverted, blocked and consumed on Park land before the water reaches Plaintiffs' points of diversion.

Plaintiffs are not requesting that the Park Service change its fire management policies. Rather, they want the consequences of those policies – debris-choked stream channels that are obstructing the flow of Plaintiffs' decreed rights – to be addressed by either Plaintiffs or NPS clearing obstructions. Ex. 1, Craig Baker Decl. ¶36 (0009).

### 2. Plaintiffs' Decreed Rights Allow Them to Transport Baker and Lehman Creek Water Unimpeded From the Sources to Their Points of Diversion Outside the Park

It has long been the law in Nevada that an appropriator can use the natural channel of any creek or stream for the transmission of water. *See Ennor v. Raine*, 27 Nev. 178, 74 P. 1, 2 (1903); *see also* NRS § 533.055 (providing that "water turned into any natural channel or watercourse by any person entitled to the use thereof, whether stored in Nevada or in an adjoining state, may be claimed for beneficial use below, and diverted from the channel or watercourse by such person."). As a result, Plaintiffs' decreed rights allow them to transport water through what is now the Park.

Plaintiffs' decreed rights date back to 1872. Ex. 1, Craig Baker Decl. ¶6 (0002); Ex. 2, Decree at p. 29 (0041). The land that is now Great Basin National Park was not withdrawn from the public domain until February 10, 1909. *See* History of the Toiyabe National Forest: A Compilation,   https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fsbdev3_042121.pdf at p.128. Plaintiffs' rights well pre-date any federal use of the land over which Baker and Lehman Creeks flow. *See id.*

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1
2
3
4
5
6
7
8
9
10
11

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The GBNP Enabling Act states that withdrawal of lands for the Park was "subject to valid existing rights." 16 U.S.C. § 410mm-1(d). Congress was clear that creation of the Park "shall [not] be construed to establish a new express or implied reservation to the United States of any water or water-related right with respect to" the lands withdrawn for the Park, and "[n]o provision of this Act shall be construed as authorizing the appropriation of water, except in accordance with the substantive and procedural law of the State of Nevada." 16 U.S.C. §410mm-1(h).

The Decree provides that any party be "perpetually enjoined and restrained" from "preventing or obstructing the flow" of water. Ex. 2 at p.26 (0038). In enforcing the Decree, the Court should not allow a junior appropriator or riparian owner, such as NPS, to interfere with the exercise of existing rights. *Kent v. Smith*, 62 Nev. 30, 39, 140 P.2d 357, 361 (1943). NPS is not entitled to special treatment simply because it is a federal agency; it is subject to the same rules of prior appropriation as any other party to the Decree. 16 U.S.C. §410mm-1(h).

### 3. Plaintiffs Have the Right to Make Streambed Improvements to Facilitate Beneficial Use and Prevent Waste, as Was Done Historically Until NPS's Interference

A key aspect of the prior appropriation doctrine is the maximization of beneficial use through the salvage of water that would otherwise be lost into a natural channel. "The preeminent public policy concern in Nevada regarding water rights is beneficial use." *Preferred Equities Corp. v. State Eng'r*, 119 Nev. 384, 389, 75 P.3d 380, 383 (2003). To make the most use of water, prior appropriation law, and the federal and state dollars invested in promoting it, encouraged farmers to use every drop of water for irrigation rather than allowing it to sink into or evaporate from desert soils. *Twaddle v. Winters*, 29 Nev. 88, 85 P. 280, 284–85 (1906), aff'd on reh'g, 29 Nev. 88, 89 P. 289 (1907). During settlement of the West, "water conservation" meant that no part of a water source should go unused by humans. As the Nevada Supreme Court explained nearly 120 years ago, "[t]he conservation of the waters in this state is the order of the day, and will increase the population and wealth, and is

1   for the public good. It should be encouraged by all legitimate means…." *Tonkin v. Winzell*, 27

2   Nev. 88, 73 P. 593, 595 (1903).

3          To that end, "[i]f waste by seepage and evaporation can be prevented by draining

4   swamps and depressions or by substituting ditches, flumes, or pipes for wide sandy and

5   numerous channels, or by other means, let this desired improvement and economy be at the

6   expense of the later claimant, who is desirous of utilizing the water thereby to be saved…."

7   *Id.* (emphasis added); *see also Buckers Irr., Mill. & Imp. Co. v. Farmers' Indep. Ditch Co.*, 72

8   P. 49, 50 (Colo. 1902) (prior appropriator may make improvements to channel "for the

9   purpose of collecting [and] controlling" seepage); *McClellan v. Hurdle*, 33 P. 280, 282 (Colo.

10  1893) (prior appropriator may make improvements to channel, including construction of dams

11  and placement of impervious material, to prevent loss of water into to stream bed); *State ex*

12  *rel. Crowley v. Dist. Court of Sixth Jud. Dist. Gallatin Cty.*, 88 P.2d 23, 29 (Mont. 1939)

13  ("The irrigator may employ any means best suited to the existing physical conditions, and all

14  the circumstances of the case….", *quoting* Long on Irrigation, 2nd ed., 202, 203, sec. 116).

15         "Salvaged water implies waters in the river or its tributaries (including the aquifer)

16  which ordinarily would go to waste, but somehow are made available for beneficial use.

17  Salvaged waters are subject to call by prior appropriators." *Ready Mixed Concrete Co. in*

18  *Adams Cty. v. Farmers Reservoir & Irrigation Co.*, 115 P.3d 638, 645 (Colo. 2005), as

19  modified on denial of reh'g (July 18, 2005).

20         [W]ater passing through the voids of any loose, permeable material filling or
           partially obstructing the channel of a stream is still water of the stream. If it all

21         sinks beneath the surface, the whole stream is subterranean. If a part sinks,
           and the remainder flows upon the surface, that which is invisible is as much a

22         part of the stream as the surface flow.

23  *City of Los Angeles v. Pomeroy*, 57 P. 585, 597 (Cal. 1899); *accord Buckers*, 72 P. at 51

24  (holding that "water saturating the sand and gravel constituting the bed of [stream] …

25  channels and sources ... is as much a part of the several streams as the surface flow, and is

26  governed by the same rules").

27         As these authorities make clear, the law not only allows, but encourages, Plaintiffs to

28  salvage and otherwise prevent water losses from the creek channels. *See Tonkin*, 27 Nev. at

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

88, 73 P. at 595. This means, at a minimum, Plaintiffs can move rocks in the stream bed to block the caves, cracks and sinks and remove obstructions so that water remains and flows freely in the Baker and Lehman Creek channels until it reaches the downstream points of diversion, as occurred historically, which is all they are asking to do here. *See Comstock v. Ramsay*, 133 P. 1107, 1111 (Colo. 1913) ("[A]ppropriators of water out of a natural stream for irrigation purposes, with priorities decreed, are entitled to have the conditions substantially maintained upon the stream as they were when the appropriations were made, and have existed during the continuance and perfection of such appropriations."). To the extent NPS contends that Plaintiffs have no right to enter onto federal land to perform such work that the Decree allows them to do, NPS must do the work itself. As the riparian landowner, NPS cannot obstruct Plaintiffs from ensuring that their decreed rights remain in the stream channel and reach their points of diversion. *Kent*, 62 Nev. at 39, 140 P.2d at 361.

## C. Defendants' Decree Violations Are Particularly Consequential Because Of The Limited Snowpack And Lower Mountain Run-Off

Immediate relief is needed from the Court because Defendants' Decree violations are having severe consequences on Plaintiffs. In 2012, approximately 2.76 cfs was lost into Sink for at least 90 days. Ex. 1, Craig Baker Decl. ¶¶18-26 (0005-0006). An estimated 2-3 cfs of Baker Creek decreed water is again being lost into Sink since July 2020. *Id.* ¶27 (0007). Early spring is a critical time for irrigation, and the drying up of Baker Creek and reduced flows on Lehman Creek affect the productivity and health of the fields and pasture. Ex. 44, Tom Baker Decl. ¶¶4-11 (0237-0238). Due to the low snowpack that currently exists, significant impacts to Plaintiffs' water rights will continue absent the Court's enforcement of the Decree. Ex. 1, Craig Baker Decl. ¶61 (0012); Ex. 39, Schaley Decl. ¶6 (0211); Ex. 40, Eldridge Decl. ¶7 (0213).

Baker Creek is the largest single source of water for the 4,000-acre Baker Ranch since 1872. Ex. 1, Craig Baker. Decl. ¶53 (0011). Lehman Creek is also a significant water source. *Id.* The water of Baker and Lehman Creeks has been put to beneficial use on the ranch continuously for 148 years. *Id.* at ¶54 (0011). Since Craig, Tom and Dave Baker's family has

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

owned the property starting in 1960, the only time a usable amount of Baker Creek water has not made it to the place of use was for a short period in 1963, three months in 2012, and 2020, when debris diverted the water into Sink and continues to do so today because NPS refuses to clear the debris or allow Baker Ranches to do so. *Id.* at ¶¶55-56 (0011-0012). Because of the water being lost into Sink, no usable amount of water from Baker Creek has reached the confluence with Lehman Creek since August 2020. *Id.* at ¶57 (0012). Baker Ranches estimates that its losses from Baker Creek in 2020 were 2,000 acre feet because Defendants refuse to allow Plaintiffs to fully exercise their decreed rights. *Id.* at ¶58 (0012). NPS's illegal diversions from Baker and Lehman Creeks compound these losses. *Id.* at ¶61 (0012).

Baker Ranches is a very successful business that provides jobs to about 25 people and contributes to jobs of many others in associated industries. *Id.* at ¶59 (0012). It produces high value products that it sells for well above average commodity prices. *Id.* (0012). As they have been since at least 1872, the waters of Baker and Lehman Creeks are critical to Baker Ranches' operation. *Id.* at ¶60 (0012).

If NPS wants to appropriate water from Baker or Lehman Creeks so it can flow into caves, cracks and sinks; support riparian vegetation; or supply its campgrounds, NPS must adhere to State law. 16 U.S.C. §410mm-1(h). Since Baker and Lehman Creeks are fully appropriated, the only way NPS could acquire such rights is by purchasing them from a willing seller. NPS cannot, by violating the Decree and interfering with Plaintiffs' exercise of decreed rights, get for free what it otherwise would have to pay for. It should be held in contempt of Court and ordered to stop violating the Decree.

///
///
///
///
///
///
///

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

IV.     **Conclusion**

Because Defendants have violated the Seventh Judicial District Court's decree for Baker and Lehman Creeks and are interfering with Plaintiffs' senior decreed rights, to the extent this Court determines it has subject matter jurisdiction, Plaintiffs request that Defendants be held in contempt and ordered to pay Plaintiffs' fees and costs associated with enforcement of the Decree.

DATED:  April 6, 2021

LEONARD LAW, PC

  /s/ Debbie Leonard
DEBBIE LEONARD (#8260)
955 S. Virginia Street, Suite 220
Reno, NV 89502
775-964-4656
debbie@leonardlawpc.com

*Attorney for Plaintiffs*

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

1

2

3

4

5

6

7

8

9

10

11

Leonard Law, PC

955 South Virginia Street, Suite 220 | Reno, Nevada 89502
775-964-4656 | Debbie@leonardlawpc.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I certify under penalty of perjury that I am an employee of Leonard Law, PC and that I caused to be electronically filed on this date a true and correct copy of the foregoing document with the Clerk of the Court using the CM/ECF system, which will automatically e-serve participating counsel. Any counsel listed below who are not registered for e-serve will be served by first-class mail:

> CHRISTOPHER CHIOU
> Acting United States Attorney
> District of Nevada
> GREG ADDINGTON
> Assistant United States Attorney
> 400 South Virginia Street, Suite 900
> Reno, Nevada 89501
>
> JEAN E. WILLIAMS
> Acting Assistant Attorney General
> U.S. Department of Justice
> DAVID L. NEGRI, Trial Attorney
> Environment and Natural Resources Division
> c/o U.S. Attorney's Office
> 1290 West Myrtle Street, Suite 500
> Boise, Idaho 83702

DATED: April 6, 2021

/s/ Tricia Trevino